IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN EUGENE WALKER,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER ON RESENTENCING**<br><br>Case No. 2:13-cr-379<br><br>Judge Clark Waddoups |

Defendant John Eugene Walker appears before this court for resentencing following the Tenth Circuit Court of Appeal's reversal and remand of his prior sentence. *See United States v. Walker*, 844 F.3d 1253 (10th Cir. 2017).

## BACKGROUND

On December 11, 2013, Mr. Walker pled guilty to two counts of bank robbery, in violation of 18 U.S.C. § 2113(a). On May 13, 2014, the court deferred sentencing for thirteen months to allow Mr. Walker to enroll in a residential treatment program. Mr. Walker returned to the court for sentencing on September 22, 2015. Based on the Presentence Report ("PSR"), the court calculated Mr. Walker's total offense level at 29 with a criminal history category of VI, resulting in a Guideline range of 151 to 188 months with a period of one to three years of supervised release or one to five years of probation. (*See* Transcript of Sentencing ("Sentencing tr.") 11, Dkt. No. 40.) The statutory maximum for this offense is 240 months. *See* 18 U.S.C. § 2113(a). There is no mandatory minimum. *See id.* The court originally imposed a sentence of time served followed by 36 months of supervised release, a $200 special assessment, and $3,695.50 in restitution. (Sentencing tr. 39; *see* Judgment, Dkt. No. 43.) The court imposed the

standard conditions of supervised release, as well as special conditions relating to restitution, drug and alcohol testing, and mental health treatment. (*See* Sentencing tr. 39-42; Judgment 3-6.)

The government appealed the sentence, and the Tenth Circuit reversed and remanded, finding the sentence substantively unreasonable in light of the statutory sentencing factors and precedent. *Walker*, 844 F.3d at 1255. In particular, the Tenth Circuit found this court focused "almost exclusively" on one sentencing factor, while "fail[ing] to give any weight to" other relevant sentencing factors. *Id.* at 1259.

On remand, the court ordered the parties to file resentencing memoranda analyzing the statutory factors outlined in the Tenth Circuit's decision and recommending a sentence for Mr. Walker based on those factors. (Dkt. No. 52.) The court also ordered the probation office to provide a written update of Mr. Walker's history while on supervised release and any other conduct that could bear on resentencing. (*Id.*) The probation office provided a written supplement to the PSR detailing Mr. Walker's conduct on supervised release, (Dkt. No. 56), and Mr. Walker and the government submitted resentencing memoranda, (Dkt. Nos. 53, 57 & 61). The court also received a victim impact statement, (Dkt. No. 62), and a written statement from Mr. Walker's mental health and substance abuse counselor, Angie Skinner.

On April 24, 2017, the court held a hearing wherein the parties presented further evidence and arguments on resentencing. The court heard testimony from twelve witnesses. The government also submitted several exhibits related to Mr. Walker's car purchase just before the robberies in May 2013 and his violations of the presentence release conditions in April 2014. The court heard argument from each side, and Mr. Walker directly addressed the court. At the conclusion of the hearing, the court indicated that it would take the resentencing decision under advisement in order to fully consider all evidence in light of the statutory sentencing factors and

the Tenth Circuit's remand opinion. Neither party objected to the continuance. The court continued the resentencing to May 18, 2017.

## SCOPE OF RESENTENCING

At the outset, the court must determine the appropriate scope of the mandate on resentencing. "Resentencing on remand is typically de novo, but an appellate court may limit the district court's discretion pursuant to the mandate rule." *United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999). In the Tenth Circuit, "the scope of the mandate on remand . . . is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *United States v. West*, 646 F.3d 745, 749 (10th Cir. 2011). The district court must look to the appellate court's mandate "for any limitations on the scope of remand and, in the absence of such limitations, exercise discretion in determining the appropriate scope." *Id.*

The remand language in this case states:

> We conclude that 33 days in pretrial detention constitutes an unreasonably short sentence. For admittedly robbing two banks as an armed[1] career offender, Mr. Walker would avoid any punishment and the sentence would give little or no weight to the congressional values of punishment, general deterrence, incapacitation, respect for the law, and avoidance of unwarranted sentence disparities. In these circumstances, we regard the sentence as substantively unreasonable.

> Reversed and remanded for resentencing consistent with this opinion.

---

[1] To avoid confusion in resentencing at this point, the court notes that Mr. Walker was not armed during the two bank robberies in this case, and the facts as pled did not establish that Mr. Walker had a firearm or any other weapon during the commission of these crimes. The Presentence Report classifies Mr. Walker as a career offender under the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq.*, and United States Sentencing Guideline § 4B1.1(a). Mr. Walker was neither charged nor sentenced under the Armed Career Criminal Act, 18 U.S.C. § 924.

*Walker*, 844 F.3d at 1259–60. The court finds this language constitutes a general remand for resentencing consistent with the opinion. Based on the record before it, the Tenth Circuit held the time-served sentence, after 33 days of pretrial detention, and 36 months of supervised release "unreasonably short" and "substantively unreasonable" because the sentence gave "little or no weight to the congressional values of punishment, general deterrence, incapacitation, respect for the law, and avoidance of unwarranted sentence disparities." *Id.* at 1259.

The Tenth Circuit's mandate does not require imposition of a specific sentence or limit this court to considering sentences only within the Guideline range. *See United States v. Brown*, 212 F. App'x 747, 751 (10th Cir. 2007) (unpublished) (noting "[a] review of [Tenth Circuit] case law shows that [the Circuit] require[s] quite a high level of specificity to limit a remand on resentencing").[2] Nor does the mandate include language prohibiting this court from varying downward from the Guideline range. *Compare United States v. Webb*, 98 F.3d 585 (10th Cir.1996) (concluding that the language in *Webb I*, 49 F.3d 636, 640 (10th Cir.1995)—"The decision of the district court to depart from the applicable guideline range is therefore REVERSED. The Case is REMANDED for resentencing within the prescribed range of twenty-seven to thirty-three months imprisonment"—prohibited the district court from departing downward from the articulated range at resentencing). Therefore, following the mandate on remand, this court must appropriately weigh the specific congressional values the Tenth Circuit identified, as well as all the 18 U.S.C. §3553(a) factors, and craft a sentence that is consistent with sentencing objectives, the Tenth Circuit's opinion, and other sentencing precedent.

---

[2] This and all other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

Finally, in keeping with the principle of de novo sentencing on remand, this court has discretion to receive "any relevant evidence the court could have heard at the first sentencing hearing." *Keifer*, 198 F.3d at 801 (quoting *United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996)). As the Supreme Court recently recognized, "[s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence. This durable tradition remains, even as federal laws have required sentencing courts to evaluate certain factors when exercising their discretion." *Dean v. United States*, 581 U.S. ___, 137 S. Ct. 1170, 1175 (2017) (citing *Pepper v. United States*, 562 U.S. 476, 487–89 (2011)). The Sentencing Reform Act specifically provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Supreme Court implemented this statutory principle in affirming that "a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper*, 562 U.S. at 481.

Thus, before considering the sentencing factors, the court will first summarize the evidence before it on resentencing, including evidence presented at the prior sentencing and new evidence received after remand.

## EVIDENCE ON RESENTENCING

### A. Prior to Remand

On May 29, 2013, a grand jury indicted Mr. Walker on two counts of bank robbery, in violation of 18 U.S.C. § 2113(a). (Dkt. No. 6.) Mr. Walker was arraigned on May 30, 2013 and

requested that the detention hearing be continued. (Dkt. No. 8.) On June 25, 2013, Magistrate

Judge Evelyn J. Furse held a detention hearing and ordered Mr. Walker released on conditions.

(Dkt. No. 13.) On December 11, 2013, Mr. Walker pled guilty to both counts of the indictment.

(Dkt No. 19.) Mr. Walker pled to the following facts:

> On May 3, 2013, [Mr. Walker] robbed the U.S. Bank located at 888 East 4500 South, in Salt Lake City, Utah while dressed as a construction worker and carrying a dark colored messenger style bag. Upon entering the bank, [Mr. Walker] approached the teller counter and demanded money from the teller. The teller complied and gave [him] approximately $2152.50 in U.S. currency, which [he] put in the bag and left the bank.

> On May 22, 2013, [Mr. Walker] robbed the Zions Bank located at 8955 South 700 East in Sandy, Utah while dressed in women's clothing and carrying a light blue purse. After entering the bank, [Mr. Walker] approached the teller counter, placed the purse on the teller counter and demanded money. The teller complied and gave [him] approximately $1543 in U.S. currency, which [he] put in the purse and left the bank.

(Dkt. No. 20.) A sentencing hearing was set for February 13, 2014, but later continued to May

13, 2014, at Mr. Walker's request. (Dkt. Nos. 19 & 23.) Mr. Walker had moved with his family

to Ohio in September 2013, was having trouble finding stable work while supporting his family,

and requested "some additional time to get his family in better financial shape before

sentencing." (Dkt. No. 22.)

Shortly before sentencing, on April 28, 2014, Mr. Walker violated his conditions of

presentence release by receiving a DUI and open container charge in Ohio. (*See* Dkt. Nos. 27 &

31.) At sentencing, Mr. Walker indicated that he had been tentatively accepted by a residential

treatment program and requested that the court defer sentencing for thirteen months to allow him

to complete the program. Mr. Walker had sold his car in order to pay for the program. (Dkt. No.

49, p. 25-26.) The government did not object, (*Id.* at 27), and the court granted the deferral, (Dkt.

No. 32). On June 4, 2015, Mr. Walker successfully completed Lansing Teen Challenge, a faith-based residential treatment program in central Michigan. (Dkt. No. 36.)

On September 22, 2015, Mr. Walker appeared before this court for sentencing. At this time, Mr. Walker had served 33 days in pretrial detention and 819 days (approximately 27 months) on pretrial/presentence release.

The PSR submitted in advance of sentencing reports that Mr. Walker has a long criminal history, which is only surpassed by his long addiction to alcohol and drugs. (Dkt. No. 39.) Mr. Walker began using alcohol at an early age and has been an alcoholic "all his life." (*Id.* at 22.) He began using methamphetamine daily in his twenties. (*Id.*) In 1987, Mr. Walker committed armed bank robberies in Nevada, for which he was incarcerated approximately 14 years (paroled in 2001). (*Id.* at 11.) While in prison, he used meth intravenously at least once per month until he got clean in 1997. (*Id.* at 22.) In 2004, he committed another bank robbery, this time in Utah, for which he served five years in prison (until 2009) and three years on supervised release (until 2012). (*Id.* at 14-15.) During the years when Mr. Walker was not incarcerated, he was convicted of several felony drug possession charges and misdemeanor DUI/intoxication charges. (*See id.* at 9-17.) From April 2009 through 2012, Mr. Walker successfully completed a term of supervised release and was apparently clean for three years, but he relapsed on meth in 2013. (*Id.* at 14, 22.) After completing Teen Challenge in June 2015, Mr. Walker had been clean from all substances for nearly two years. (*Id.* at 23.)

At sentencing, Mr. Walker first objected to the career offender enhancement in the PSR, but, after hearing argument from the parties, the court found that the enhancement applied. (*See* Dkt. No. 40, pp. 3-11.) The court accepted the PSR and calculated Mr. Walker's total offense level at 29 and criminal history category at VI (with or without the career offender

enhancement), resulting in a Guideline range of 151 to 188 months. (*See* Dkt. No. 39; Dkt. No. 40, p. 11.) The government, represented by Assistant United States Attorney Drew Yeates, recommended a sentence of 120 months, noting its concern with Mr. Walker's history of bank robberies, but also a concern about a within-guideline-range sentence for a defendant of Mr. Walker's age (at that time, 55 years old). (*See* Dkt. No. 40, p. 12.) Mr. Walker's counsel, Federal Defender Adam Bridge, argued that considering the sentencing factors in light of Mr. Walker's extensive rehabilitation, a five-year term of probation would be sufficient to serve the purposes of sentencing in Mr. Walker's case. (*See id.* at 12-16.) Mr. Walker addressed the court and spoke at length about the difference Teen Challenge had made in his life, both for his relationships with his family and his engagement with his community. (*See id.* at 16-27.) Ms. Walker (formerly, Ms. Detry) also spoke to how Teen Challenge had changed Mr. Walker. She felt that Mr. Walker "did do [his] time" while in Teen Challenge, noting that the program was very long and strict, resulting in many failures by others, and employed a "work your way up" ethic under which Mr. Walker excelled. (*See id.* at 27-33.) The court then discussed the § 3553(a) factors and ultimately imposed a time-served sentence to be followed by 36 months of supervised release. (*Id.* at 33-39; *see also* Judgment, Dkt. No. 43.)[3]

   *B. After Remand*

   On resentencing, the court has received additional evidence spanning from Mr. Walker's commission of the two bank robberies in May 2013 through his pretrial/post-release conduct as of April 2017.

___

[3] Because the sentence was set aside on appeal, and the court now undertakes de novo resentencing, the court will not recite its prior sentencing analysis.

First, the Probation Office submitted a Supplemental Memorandum to the PSR. (Dkt. No. 56.) Probation Officer Renee Lewis stated that since the September 2015 sentencing, Mr. Walker has been supervised in the Northern District of Ohio. (*Id.* at 1.) His supervising probation officer in Ohio, Adam Jones, reported that Mr. Walker has complied with all conditions of supervision, including maintaining employment, paying restitution monthly, and completing random drug testing with no positive results. (*Id.*) Mr. Walker works for R.B.P. One, Inc. as a painter and has earned several raises. (*Id.*) He and his wife live a modest life, and he continues to work on restoring his relationships with his siblings and children. (*Id.* at 1-2.) Mr. Walker also continues to see a mental health counselor once a month and has remained sober with no relapses. (*Id.* at 2.) He attends church, self-improvement classes offered by his church, and Alcoholics Anonymous (AA) meetings. (*Id.*) He has led several AA groups, which have given him the opportunity to speak about his experiences and sobriety. (*Id.*)

The court also received a written statement from Angie Skinner, Mr. Walker's court-ordered mental health counselor and a Licensed Clinical Christian Counselor. Ms. Skinner reports that Mr. Walker has made "significant improvement in every area of his life and has taken his recovery very seriously." She reports that he has been clean since April 29, 2014, and that he no longer has cravings for drugs or alcohol. Mr. Walker got married on December 31, 2015. Ms. Skinner considers him "a contributing member of society" who "provides for his family and is a faithful husband and father." Along with the church and AA meetings, Mr. Walker has completed volunteer work at his church, including painting and repairs. Ms. Skinner recalls that when she first began meeting with Mr. Walker, in November 2013, "he was a very lost and broken man who had suffered with addiction and depression for most of his life." Ms. Skinner saw that when life became challenging or stressful, Mr. Walker would turn to drugs and

alcohol to cope, which led him "to make very poor decisions." Mr. Walker still has many stressors in his life since completing Teen Challenge, including helping his wife through three major surgeries and recovery, but now he "turns to God, his faith community and mentors for help instead of drugs or alcohol and handles all stressors in his environment appropriately." Ms. Skinner concludes with her professional opinion that Mr. Walker "has been rehabilitated and there is absolutely no evidence to suggest otherwise," and that Mr. Walker "is a healthy, happy member of society."

Mr. Walker's resentencing memorandum also includes a small flood of letters from staff at Teen Challenge, his pastor, church and community members, members of his anti-addiction classes, his wife, his step-daughter, and his employer, all uniformly praising his character, work ethic, and the progress he has made in the past years. (*See* Dkt. Nos. 53-2 through 53-6.)

Finally, the court received a victim impact statement from an unnamed victim.[4] (Dkt. No. 62.) The victim states that Mr. Walker's robbery of U.S. Bank "took my sense of security." The victim recounts Mr. Walker yelling and aggressively demanding money. The victim was not sure if Mr. Walker was armed, but noticed his right hand close to his waist band. The victim "felt helpless" at the time and has been uneasy in public places since the robbery, feeling that he "cannot fully relax" in public because "in [his] mind there is always potential for danger." The victim notes that Mr. Walker clearly put thought into the robbery by dressing as a construction worker, and related a belief that Mr. Walker "will attempt to rob again and hurt or kill someone next time." The victim concludes that "[i]f someone can rob banks and then be out on the streets again within a few years, I think the justice system is failing in protecting citizens."

---

[4] It became clear during the evidentiary hearing on resentencing that Mr. Austin Bentley, a former teller at U.S. Bank, drafted and submitted this victim impact statement in April 2017.

At the resentencing hearing, Assistant United States Attorneys Cy Castle and Drew Yeates appeared on behalf of the government, and Federal Defender Adam Bridge appeared on behalf of Mr. Walker. The government first called eight witnesses: Rob Scott, Heather Blanco, Stephen Rick Brimley, Chris Platts, Chanelle Torgerson, Austin Bentley, Scott Quillen, and Cameron Moss.

### 1.  Law Enforcement Testimony

In 2013, Sergeant Rob Scott was a detective for the violent crimes unit of the Unified Police Department. (Transcript of Evidentiary Hearing on Resentencing ("Resentencing tr.") 12, Dkt. No. 68.) Sgt. Scott was assigned to investigate the Zions Bank robbery. (*Id.*) Sgt. Scott also transported Mr. Walker from the Salt Lake County Jail to the federal courthouse on May 28, 2013. (*Id.* at 13.) During transportation, Sgt. Scott began talking with Mr. Walker about why he committed the robberies, and Mr. Walker said that since being released from federal prison he was having financial trouble and having a hard time making ends meet. (*Id.* at 14.)

Sergeant Heather Blanco was a detective in the person crimes unit of the Sandy City Police Department in 2013, and she was also assigned to investigate the Zions Bank robbery. (*Id.* at 15-16.) Sgt. Blanco arrested and interviewed Mr. Walker about the robbery. After waiving his *Miranda* rights, Mr. Walker told Sgt. Blanco that he robbed the bank because he was having a difficult time financially and was not making enough at his job to pay all of his bills. (*Id.* at 16-17.) Sgt. Blanco also explained that Mr. Walker had entered the bank with a foil-lined purse, and that the purpose of the foil would be to defeat any GPS location device the bank might turn over with the money. (*Id.*) Sgt. Blanco further testified that Mr. Walker had a getaway driver during the robbery, but he did not assist police officers in identifying that person. (*Id.* at 17-18.)

### 2. Employment & Car Dealership Testimony

Stephen Rick Brimley is co-owner of Mountain States Moving and Storage Company and Quick Transportation. (*Id.* at 19.) Mr. Brimley employed Mr. Walker as a local truck driver from April 2, 2012 through May 23, 2013. (*Id.*) Mr. Walker received one raise at some point after the first four months of his employment. (*Id.* at 22.) Mr. Brimley found Mr. Walker to be a very helpful and good employee until the end of his tenure with the company. (*Id.* at 20-21.) During the last month of his employment, Mr. Brimley thought Mr. Walker became somewhat negative and confrontational, and seemed to resent having to come to work. (*Id.* at 21-22.) On May 3, 2013, Mr. Walker left work early, saying that he had met a girl and that they were going to move away from Utah. (*Id.* at 24.)

Mr. Walker passed a pre-employment drug screen, but he was not selected to be randomly drug tested at any other time during his employment with the trucking company. (*Id.* at 23, 24.) The random drug screens would not have tested for alcohol. (*Id.* at 25.) Mr. Brimley did not recall Mr. Walker having any drug problems that the company was aware of while he was employed. (*Id.* at 23.) When Mr. Walker was arrested, Mr. Brimley was present and was aware that the police found drugs and syringes in Mr. Walker's lunch box. (*Id.* at 25.) Mr. Brimley agreed that Mr. Walker may have been using drugs before his arrest, but Mr. Brimley did not know if he was using them or selling them. (*Id.* at 25.)

Chris Platts owns a car dealership at 4000 South State in Salt Lake City. (*Id.* at 26.) In May 2013, Mr. Platts sold Mr. Walker a green Toyota Solara with gold trim. (*Id.* at 27.) Mr. Walker's girlfriend (now wife) Vicky Detry was a joint applicant for the vehicle. (*Id.*; *see* Gov't Ex. 101, Dkt. No. 65.) On May 2, 2013, Mr. Walker and Ms. Detry signed a promissory note for $500 as a down payment for the vehicle. (Resentencing tr. 29; *see* Gov't Ex. 104, Dkt. No. 65.)

Mr. Platts confirmed that Mr. Walker timely paid the down payment on or before May 16, 2013, and had possession of the car before that date. (Resentencing tr. 30.) Mr. Walker and Ms. Detry received financing for the car in the amount of $6,454.95. (*Id.* at 31; *see* Gov't Ex. 105, Dkt. No. 65.) Mr. Platts recalled Mr. Walker as a nice guy who was pleasant to work with and on time with his obligations. (Resentencing tr. 32.) Mr. Platts did not perceive Mr. Walker to be under the influence of any drugs or alcohol during their interactions. (*Id.*) On the day Mr. Walker paid the $500 down payment, he brought a young man with him as an attempted referral. (*Id.* at 32-33.) The young man appeared to Mr. Platts to be on drugs and attempted to sell Mr. Platts a firearm, but Mr. Platts was not interested. (*Id.* at 33.)

### 3. Victim Testimony

Chanelle Torgerson was the first victim to testify. Ms. Torgerson worked for U.S. Bank as a head teller on May 3, 2013, during the robbery. (*Id.* at 35.) When Mr. Walker entered the bank screaming, Ms. Torgerson thought he was a grumpy customer and approached him to try to diffuse the situation. (*Id.* at 36.) Mr. Walker, who was dressed as a construction worker and had what looked like a soft cooler bag with him, was yelling "top and bottom, top and bottom" at another teller named Austin. (*Id.* at 36-37.) When Ms. Torgerson realized that this was a robbery, she began handing him the money in her top and bottom drawers, including a tracker. (*Id.* at 38.) She described Mr. Walker as ignorant and confused, and reported to officers afterwards that he was high and "not himself." (*Id.* at 38, 41.) She did not like how he was screaming and being disrespectful toward them. (*Id.* at 38.) Mr. Walker kept screaming for more money, and Ms. Torgerson kept saying her drawers were empty, at which point Mr. Walker left. (*Id.* at 39.) Ms. Torgerson had never been part of a robbery before, and she testified that it has affected her life "a little bit." (*Id.*) She continued: "When I go into the bank, I have to be more paranoid now that

this trial has been back up and everyone is bringing it back up, like, I have anxiety when I see construction workers. I know it's weird, but it happens." (*Id.*) A counselor spoke to the employees the Monday after the robbery, but Ms. Torgerson has not sought counseling since. (*Id.* at 40, 42.) Ms. Torgerson felt that the contact brought about by the resentencing had re-opened some of the experiences associated with the robbery. (*Id.* at 42.)

Austin Bentley was shadowing tellers at the U.S. Bank on May 3, 2013. (*Id.* at 44-45.) He recalled that a man walked quickly into the bank dressed as a construction worker, cut in front of another customer, put a bag on the counter, and said aggressively and loudly "fill it up, top and bottom." (*Id.* at 45.) At one point, Mr. Walker backed away from the counter and put his hand over his hip area, and the thought went through Mr. Bentley's head that Mr. Walker could be armed, though Mr. Bentley did not see any weapon. (*Id.*) When asked whether the robbery impacted his life, Mr. Bentley said: "I would say that it has. Definitely a little more anxious when I see things that I feel are out of place in, you know, public settings or banks, things like that." (*Id.* at 45-46.)[5]

Scott Quillen was the branch manager at U.S. Bank on the day of the robbery. (*Id.* at 48.) Mr. Quillen was sitting in the bank desk, facing the door, and initiating a wire transfer for a customer when he realized there was an irate individual, dressed in construction clothing, in the lobby. (*Id.* at 49.) As the branch manager, Mr. Quillen felt that he had to respond. (*Id.*) When Mr. Quillen approached, however, Mr. Walker started toward him and asked him if he wanted to get hit and wanted to be on the ground. (*Id.* at 50.) Mr. Quillen had never before experienced a bank robbery or physical threat. (*Id.*) After this experience, Mr. Quillen stated: "I feel a more presence

---

[5] Mr. Bentley also submitted the victim impact statement at Docket Entry 62, summarized *supra*, at 10.

of anxiety, a general nervousness. I made sure, at that location, I had moved to an office location where my desk would face a window so I could monitor the parking lot at all times for people coming in and going out of our building." (*Id.* at 51.)

Cameron Moss was a teller at Zions Bank during the robbery on May 22, 2013. (*Id.* at 52.) Mr. Moss recalled that, shortly before closing, a man dressed in women's clothing walked purposefully into the bank. (*Id.*) Mr. Moss immediately knew that a robbery was taking place and tried to alert his coworkers. (*Id.* at 53.) Mr. Walker asked Mr. Moss in a woman's voice to give him all of the money. (*Id.*) After Mr. Moss declined, Mr. Walker slammed his hands on the counter and yelled multiple times in a man's voice "give me all of your money." (*Id.*) Mr. Moss pulled the silent alarm and started giving Mr. Walker money as slowly as he could. (*Id.* at 54-55.) Mr. Moss noticed Mr. Walker gesturing to his chest and shoulder multiple times; though he did not note the significance at the time, others in the branch afterwards said a holster was under his arm. (*Id.* at 54.) Mr. Walker asked for money from the other drawers, and Mr. Moss went to each until they were empty. (*Id.* at 55.) At some point, the branch manager approached Mr. Walker from behind, and Mr. Walker turned to yell something in reference to bodily harm at him. (*Id.* at 56.) Mr. Walker then left, seeming agitated and frustrated that he did not get what he needed or wanted. (*Id.*) Mr. Moss followed Mr. Walker to the getaway vehicle, a green Toyota Solara with gold trim and dealer's tags. (*Id.* at 57.) Mr. Moss wrote down the information for the car as it drove away. (*Id.*) Mr. Moss felt the whole situation was threatening, but noted that he had lived abroad and experienced multiple life-threatening incidents that had changed his opinion of dangerous situations. (*Id.* at 54, 57-58.)

### 4. Probation Officer, Mental Health Counselor, and Pastor Testimony

After the government's final witness, Mr. Walker called Adam Jones, Angie Skinner, and Danny Akers to testify via videoconference from Ohio.

Probation Officer Adam Jones began supervising Mr. Walker in Ohio in June 2016.[6] (Resentencing tr. 59-60.) Mr. Jones sees Mr. Walker quarterly and has conducted three home visits during his period of supervision, with no violations of concern. (*Id.* at 61, 69.) Mr. Jones reported that Mr. Walker lives in a modest home, which was formerly his father-in-law's home, with his wife and a few pets. (*Id.* at 61.) Mr. and Ms. Walker also sometimes care for their granddaughter. (*Id.*) Mr. Jones reported that Mr. Walker has complied with all conditions of supervision, made regular restitution payments, submitted to random drug screens, and attended mental health treatment. (*Id.* at 62.)

The Probation Office's Post-Conviction Risk Assessment (PCRA) factors place Mr. Walker at a low to moderate risk level. (*Id.* at 67.) The PCRA measures various risk factors related to the offender—both static (age, criminal history) and dynamic (employment, drug and alcohol use, social networks, criminal thinking)—so the probation office can identify and address any risk areas and prevent recidivism. (*Id.* at 62-63.) Considering the dynamic factors, Mr. Jones was unable to identify any present criminal cognition concerns or anti-social associations in Mr. Walker's case. Rather, Mr. Jones acknowledged a number of pro-social activities and positive voluntary associations in which Mr. Walker engages, including church functions, addiction recovery meetings, and marriage classes. (*Id.* at 64-65.) Mr. Walker has a stable job as a painter

---

[6] Mr. Walker has been on supervised release since September 2015—and on pretrial/presentence release since June 2013—but his prior probation officer in Ohio retired before Mr. Jones could speak with him personally. (*Id.* at 60.) Mr. Jones learned about Mr. Walker's prior conduct on supervised release by reading the file and other relevant documentation on the case. (*Id.*)

and recently received a raise. (*Id.* at 66.) He has not failed any drug screen on supervised release. (*Id.* at 67.) Mr. Jones felt that Mr. Walker has not shown any risk of recidivating at this time and that Mr. Walker has done exceptionally well relative to other career offenders and bank robbers he supervises. (*Id.* at 68, 75.)

On cross examination, Assistant U.S. Attorney Yeates asked Mr. Jones if Mr. Walker's position today would be similar to his position in May 2013, when he also had a job, girlfriend, and church. (*Id.* at 70-71.) Mr. Jones did not know Mr. Walker in 2013, but responded that, based on those factors, he would assume the positions were similar. (*Id.* at 71.) The government also submitted documentation of Mr. Walker's presentence release violation in April 2014, including citations for an open container and DUI. (*Id.* at 72-73; *see* Gov't Exs. 107-111, Dkt. No. 65.) In the citation, Mr. Walker's blood alcohol content was measured at .151. (Resentencing tr. 72; *see* Gov't Exs. 107, 108 & 111.) Mr. Jones could not say whether Mr. Walker was attending drug treatment at that time, though he would have been required to as a condition of his release. (Resentencing tr. 73-74.)

The court asked Mr. Jones whether, based on his experience as a probation officer and his supervision of numerous individuals, he had an opinion about whether a long period of incarceration for Mr. Walker would provide any assistance in protecting the public. Mr. Jones opined:

> I don't believe it would be beneficial in Mr. Walker's case. I think he has shown, throughout his time on supervised release, that he is amenable to supervision, that it has been effective. I realize that there are similar characteristics to when he— when he committed the instant offense that are similar now, but I, you know, unfortunately, I don't have—I didn't have the opportunity to know Mr. Walker before to really compare the differences between the two, but I can say that, you know, he's shown a lot of progress. He's shown that he can comply with the conditions of supervision. And I would personally attribute it to his dedication to his faith and his religion that seems to have motivated him to make those positive

changes in his life. So, at this time, I don't think a custody sentence would be beneficial in Mr. Walker's case. I think it would be the opposite.

(*Id.* at 76-77.)

Angie Skinner, Mr. Walker's mental health and substance abuse counselor, also testified from Ohio. Ms. Skinner is a clinical Christian counselor licensed through the National Christian Counseling Association. (*Id.* at 77-78.) Starting in November 2013, Ms. Skinner saw Mr. Walker for counseling sessions about twice a month until he went to Teen Challenge. (*Id.* at 78-79.) After Teen Challenge, Ms. Skinner and Mr. Walker started meeting monthly. (*Id.* at 78.) Ms. Skinner discussed how their counseling sessions have changed over time. Before Teen Challenge, they would address Mr. Walker's depression, anxiety, hopelessness, fear of the future, and drug and alcohol addiction by working through his past, working toward forgiveness, and attempting to change his mindset. (*Id.* at 79.) Now, they focus on strategies for dealing with life stressors and keeping him accountable to his faith. (*Id.* at 79-80.)

Following up on her written statement to the court, summarized *supra*, at 9-10, Ms. Skinner confirmed that Mr. Walker has been completely sober since April 2014 and is "completely effective in society at this point." (*Id.* at 81.) When asked what makes Mr. Walker different today from May 2013, Ms. Skinner stated:

> He absolutely is in a different position. When I first saw him, he had a lot of mental health issues, including depression, anxiety, hopelessness, helplessness. He had sleep problems. There were many things contributing to his issues. And now, if you look at him today, he's very stable, very consistent. Prior to Teen Challenge, I would have said that he was very inconsistent. He had anger issues. He had some trouble dealing with his emotions. I noticed that one of the people that testified that he used to work for said that a month prior to the—I believe it was the month prior to the robbery, that they noticed a change in his personality and that he was much more agitated at work.
>
> Those were the kind of things that we would look for now, and we don't see any of that. Did I see agitation before Teen Challenge[]? Yes, I did. He struggled. He struggled to manage his life. He struggled to deal with any kind of stress, and that

> would tie into the drug addiction and the alcohol addiction which came out in the DUI right before he went to Teen Challenge.
>
> Now we don't see any mood changes, we don't see any personality changes. There's no health issues. There's no money issues, you know, that we are aware of that he isn't managing. There's no stressors, and there's also no mental health issues. He is not depressed. He is not anxious. He is just a very healthy individual at this time.

(*Id.* at 82-83.) Ms. Skinner noted that Mr. Walker is involved in church activities on Wednesday and Sunday and addiction-related meetings on Friday nights. (*Id.* at 83.) She finds Mr. Walker has shifted from reactive to "very proactive" about his mental health and recovery, noting that he always contacts her to set up their monthly appointment. (*Id.*) Ms. Skinner observed that Mr. Walker's life has not been stress-free recently. His wife went through three major surgeries and was out of work during that time, and his step-daughter and her child were also living with them for a time. (*Id.* at 84.) Mr. Walker now has a strategy and support system for dealing with his life stressors:

> He handles situations appropriately by leaving the situation, getting himself together, calming down, praying, doing whatever he needs to do.
>
> He also contacts me. He also contacts his pastor. He has accountability in his life, which is a huge issue in the world of recovery. If you have accountability, you're much more likely to succeed, and he knows who he can go to, when he's struggling, for help.

(*Id.* at 85.) Ms. Skinner confirmed that she sees no warning signs from Mr. Walker's past in his life today. (*Id.*) She opined that Mr. Walker's being away from his current support system would "absolutely have a negative effect on him." (*Id.* at 89.)

Ms. Skinner also described the Teen Challenge program. At Teen Challenge, individuals are taught foundational skills and good work ethic, how to deal with life stressors, how to change a mindset, and how to build their faith. (*Id.* at 80.) She noted that Teen Challenge is "a very intense program, very much from morning 'til night they are doing something. There is work

involved, service involved and lots of reading, studying, teaching, those kinds of things." (*Id.*)

Ms. Skinner attributes Mr. Walker's current ability to manage life stressors to Teen Challenge.

When asked about what had changed between Mr. Walker's DUI citation in April 2014 and now,

Ms. Skinner said "he had not attended Teen Challenge." (*Id.* at 87.) Ms. Skinner also agreed that

the possibility of a 188 month prison sentence could motivate a person to do the best he or she

could prior to sentencing. (*Id.* at 88.)

Finally, Danny Akers, Mr. Walker's pastor, testified from Ohio. Mr. Akers has been a

pastor for 28 years. (*Id.* at 90.) He also has a history of addiction and criminal activity. (*Id.* at

92.) Mr. Akers met Mr. Walker last August at the church's Friday night deliverance class,[7] a

class he describes as very successful. (*Id.* at 90, 92.) For example, the Crawford County, Ohio

trial court has a program allowing defendants to choose to attend a faith-based program,

including Teen Challenge and Mr. Akers' Friday night deliverance class, as a part of their

rehabilitation. (*Id.* at 90-91; *see* Akers letter, Dkt. No. 53-3 at 2.) Mr. Akers explained that Teen

Challenge was originally targeted toward teens suffering from drug abuse on the streets of New

York, but later expanded to all ages and over 400 facilities across the United States. (*Id.* at 91.)

Through his relationship with the Crawford County judge, Mr. Akers has learned that Teen

Challenge has a success rate of about 80%, as compared to Ohio's 15% success rate. (*Id.*)[8] Mr.

Walker has led the Friday night deliverance class twice, and Mr. Akers found him to be "very

compassionate," listening to other people's problems and giving "sound advice based upon his

experience." (*Id.* at 93.) Mr. Akers has seen successes and failures in his program and, though his

---

[7] Mr. Akers describes the deliverance class as seeking the "deeper root cause" to an individual's behavior and taking care of the root so "the behavior and other things follow." (*Id.* at 92, 95-96.)
[8] Teen Challenge's extraordinarily high success rate for graduates remaining drug and crime free is confirmed by independent studies compiled in its program brochure. (*See* Def.'s Resentencing Mem., Ex. B, Dkt. No. 53-2.)

evidence is only anecdotal, he estimates a greater than 50% success rate. (*Id.* at 95-96.) In Mr.

Akers' experience, Mr. Walker is succeeding, and Mr. Akers sees "no reason to doubt his

success." (*Id.* at 95.)

### 5. Ms. Walker's Testimony

Mr. Walker's wife, Vicky Walker, testified next in person. She and Mr. Walker married

on December 31, 2015, about three months after the prior sentencing. (Resentencing tr. 97.) Ms.

Walker described how she and Mr. Walker moved to live in a modest home in Shelby, Ohio so

that she could care for her ailing father. (*Id.* at 98.) They have rescue animals, and sometimes her

daughter and granddaughter stay over. (*Id.*) Mr. Walker's relationship with her daughter started

out very badly but has slowly and gradually improved, to the point that her daughter now calls

him the dad she never had. (*Id.* at 99-100.) Her daughter and granddaughter rely to some extent

on Mr. and Ms. Walker for financial support. (*Id.* at 100.) Because of Ms. Walker's three

surgeries, Mr. Walker currently provides all of the household income. (*Id.* at 103.) Ms. Walker

was recently approved for disability, but even with her disability checks, she will not be able to

afford all of her bills without Mr. Walker's income. (*Id.* at 102-03, 105.)

Mr. Walker committed the robberies in May 2013 while Ms. Walker was out of town

caring for her father. (*Id.* at 104.) She had noticed that his behavior had changed shortly before

the robberies, and she thought he might be on drugs again. (*Id.*) But he denied drug use when she

asked him, and she could not observe him closely while she was in Ohio. (*Id.*) Comparing that

time with the present, Ms. Walker noted:

> He never gets agitated. We can talk about anything. I can tell him anything and
> not worry. I mean, my daughter, she can be in the worst situation, and I can be the
> one that loses it and screams or something. And he's like: Just calm down.
>
> And we end up walking away and coming back. If we have an argument, we walk
> away, and five minutes later we're back together talking about it and not yelling,

not screaming. I mean, he has no irritation at all now. He has God in his life
instead.

(*Id.* at 104-05.) When asked to make a statement about the effect a term of imprisonment

would have on her and her family, Ms. Walker stated:

> I would not be able to pay my bills, even though I would get over $1200 in
> disability. Mieka, my 14-month-old granddaughter, would lose her grandpa, who
> she loves more than me. And I watch her. He walks in the house, and she just
> lights up and goes running to him. My daughter and I wouldn't have such a good
> relationship because I would have probably cut ties a long time ago, but thanks to
> Johnny, I haven't, and I would have regretted it. This absence, I don't think I
> could—I don't think I could go on. I really don't.

> He—I have been married two other times, and no man in my entire life, including
> my father, has treated me any better than he has. He has been the best. He has
> taken care of me. He has cooked for me. He has [done] laundry for me. He has
> cleaned the house. I mean, he has been my one. He has been my rock, and take
> him away, I don't—I don't know how I can do it.

(*Id.* at 105-06.)

### 6. Further Victim Statements

The court took a brief recess at the close of evidence. Upon returning, the government

requested that the victims remaining in the courtroom—at that time, Chanelle Torgerson and

Scott Quillen—be permitted to opine on what prison sentence they believed would be

appropriate for Mr. Walker. (Resentencing tr. 106-07.) Mr. Quillen stated:

> The statement that I would make is on the day that Mr. Walker did rob the U.S.
> Bank branch, I did have legitimate fear for my safety, the safety of the others in
> the branch, and then, ultimately, my life when he did turn to me and start coming
> at me and mentioned that I would be on the ground. Proceeding this event, I have
> taken a different position with the bank. I no longer manage a branch for some of
> the security reasons and not being responsible for others or having to work with
> individuals that escalate into violent circumstances.

(*Id.* at 107-08.)

Ms. Torgerson declined to make any statement. (*Id.* at 108.)

### 7. Arguments of counsel

The court had received and reviewed resentencing memoranda from both sides prior to the resentencing hearing. (*See* Dkt. Nos. 53 & 61.) At the hearing, each side elaborated on their recommendations and arguments. (*See* Resentencing tr. 108-52.)

The government recommends 120 months of incarceration in this case. During arguments, Assistant U.S. Attorney Castle emphasized validating the victims' experiences, and protecting potential victims from other defendants who might be deterred. Mr. Castle recognized that this resentencing was essentially a clean slate for everyone. He explained that the government's recommendation of 120 months was the same as their previous recommendation and included credit for the progress Mr. Walker has made. Mr. Castle highlighted the seriousness of the offense and the planning involved in committing the robberies. He argued that the evidence showed Mr. Walker's motivation for the robberies was purely financial, not drug-related, because he had contracted to buy a car shortly before the robberies. Mr. Castle agreed that Mr. Walker's 20 years in prison previously had apparently not deterred him, but argued a 120-month sentence would protect the public for that length of time and serve to sanction Mr. Walker for the robberies. Mr. Castle emphasized the Tenth Circuit's footnote that Mr. Walker had been clean for three years previously before he relapsed and committed these robberies, and Mr. Castle posited that Mr. Walker's good behavior even now was motivated by the substantial prison sentence looming overhead. Mr. Castle noted that, based on Mr. Walker's status as a career offender and his criminal history category, there is a high likelihood he will recidivate. Mr. Castle also contended that the "just punishment" factor is essentially equivalent to incarceration, noting that "the government just simply disagrees with the Court that there has to be some purpose to punishment." (*Id.* at 129.)

Mr. Walker seeks five years of probation, a substantial period of home confinement, and community service. His counsel, Federal Defender Bridge, first highlighted the tensions within the sentencing factors and how the act of balancing necessarily causes some to be weighted more heavily than others in any individual case. Mr. Bridge contended that because the Guidelines recommend incarceration in almost every case, they often elevate retribution or punishment over other sentencing goals. He noted that the sentences available in this case vary from up to 10 years of probation (five years on each count) to up to 40 years of incarceration (20 years on each count). He also pointed out that, according to the statistics, a small but significant minority of career offenders are not sentenced to incarceration, although it is difficult to get a clear picture of the total number or the circumstances of the cases because the Sentencing Commission's data are not readily available. In addressing the government's argument that these robberies were only motivated by financial concerns, Mr. Bridge stated that he had never represented a bank robber who committed a robbery for greed; rather, robbery is "the epitome of irrational, short-term, drug-addicted thinking, and Mr. Walker embodies that, unfortunately." (*Id.* at 142.) Mr. Bridge also argued that while the government heavily emphasizes Mr. Walker's criminal history, at some point that history must give way to Mr. Walker's conduct for the past four years, including his success on supervised release. Mr. Bridge believed that a term of probation currently does, and would continue to, protect the public and ensures a lower risk of recidivism than incarceration. He noted that uniformity in sentencing procedure, not just a sentence's substance, contributes to fairness and avoidance of sentencing disparities. He argued that Mr. Walker's case is not the typical career bank robber and that any disparity between his sentence and others would be a warranted disparity.

### 8. Mr. Walker's Allocution

Finally, Mr. Walker addressed the court. He started by identifying Teen Challenge as his turning point. He asked to make amends for his crimes. With the court's permission, Mr. Walker turned to the victims remaining in the courtroom and apologized for any discomfort and fear they felt during the robberies and since. He acknowledged that the government was correct in stating the robberies were motivated by money, but contended that "I would never do a bank robbery if I wasn't under the influence." (Resentencing tr. 153.) He admitted that he was using methamphetamine "pretty much daily" and that the planning that went into the robberies was partly from being high and not "thinking correctly." (*Id.*) He had made attempts to get clean and sober during his life and agreed that he had done well during the 36 months of supervised release prior to these robberies, but admitted that even then he was not completely sober or committed to recovery because he would drink "if there was a window of opportunity." (*Id.* at 153-54.) He asserted that his good behavior has not been motivated by threat of a lengthy prison sentence, observing that after he was sentenced to time served and before he knew about the appeal, he did not stop or "slow down" his recovery efforts—he increased them. (*Id.* at 155.) He related that his boss values his employment and is proud of the progress he has made. (*Id.* at 155-56; *see* Employer's letter, Dkt. No. 53-6.) In sum, Mr. Walker believes this time is different because he has been "transformed" from his old ways and has finally beaten his addiction. (*Id.* at 156.)

### RESENTENCING ANALYSIS

Neither party disputes the application of the Guideline range of 151 to 188 months this court previously adopted. Mr. Walker argues for a downward variance from the Guideline range to a sentence of five years of probation, a substantial period of home confinement, and community service. (Dkt. No. 53, p. 1.) The government argues for imposing a prison sentence

of at least 120 months. (Dkt. No. 61, p. 2.) Both positions recommend at least some downward variance from the Guideline range of 151 to 188 months.

Upon consideration of all of the evidence, the parties' resentencing memoranda and oral arguments, the Tenth Circuit's remand opinion, case law, and other relevant authorities, the court now sentences the Mr. Walker to ten years of probation, with a mandatory review in five years, plus two years of home confinement, with case-appropriate monitoring and the standard exceptions, and 500 hours of community service, which is approximately five hours per week for 24 months. Further, the previous special assessment and restitution will be reimposed with credit for the sums already paid. This sentence is warranted primarily by Mr. Walker's substantial post-offense self-rehabilitation through residential treatment and other programs that he continues to engage with today; the mitigating effect of his lifelong addiction; the vast and stable network of support Mr. Walker has constructed; the lack of any need to protect society from Mr. Walker and the marginal deterrent effect a lengthy term of imprisonment would have on other bank robbers; Mr. Walker's advanced age; the recommendation of his probation officer; and the evidence suggesting imprisonment would not achieve sentencing goals in this case.

### A. Sentencing principles

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Thus, courts impose the punishment that "fit[s] the offender and not merely the crime." *Pepper*, 562 U.S. at 487–88 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). The court must sentence the individual who appears before it on that day. *Pepper*, 562 U.S. at 492 (quoting *United States v. Bryson*, 229 F.3d 425,

426 (2d Cir. 2000)). Therefore, "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 488 (quoting *Williams*, 337 U.S. at 247).

Though "effectively advisory" after *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing Guidelines remain "the starting point and the initial benchmark" for sentencing in a district court. *Gall v. United States*, 552 U.S. 38, 49 (2007). This starting point is critical "[a]s a matter of administration and to secure nationwide consistency" in sentencing. *Id*. After considering this initial benchmark, the district court should consider "all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49–50.

"The sentencing court's discretion is constrained by Congress, which requires consideration of seven factors:

1. Offense and offender characteristics;

2. the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, and (d) rehabilitation;

3. the sentences legally available;

4. Sentencing Commission Guidelines;

5. Sentencing Commission policy statements;

6. the need to avoid unwarranted sentencing disparities; and

7. the need for restitution."

*Walker*, 844 F.3d at 1256 (citing *Rita v. United States*, 551 U.S. 338, 347–48, (2007)); *accord* 18 U.S.C. § 3553(a). Sentencing courts are guided by the "parsimony principle," which opens section 3553(a) and states that a court "shall impose a sentence sufficient, but not greater than necessary" to achieve the purposes of sentencing expressed in § 3553(a)(2). *United States v. Martinez-Barragan*, 545 F.3d 894, 904 (10th Cir. 2008) (quoting § 3553(a)). Moreover, the Supreme Court has emphasized that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Pepper*, 562 U.S. at 491.

"Sentencing courts have the unique ability to appraise the evidence and personally assess a defendant." *United States v. Medearis*, 451 F.3d 918, 922 (8th Cir. 2006). And "[w]hen the defendant makes 'a nonfrivolous argument for leniency,' the district court 'must somehow indicate that [it] did not rest on the guidelines alone, but considered whether the guideline sentence actually conforms, in the circumstances, to the statutory factors.'" *Martinez-Barragan*, 545 F.3d at 903 (quoting *United States v. Jarrillo-Luna*, 478 F.3d 1226, 1230 (10th Cir. 2007)). But before a court imposes a sentence that varies from the guidelines, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "[A] major departure should be supported by a more significant justification than a minor one." *Id*. And the district court must explain its sentence adequately "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*. The sentencing judge must demonstrate that "he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 551 U.S. at 356. By explaining the basis for a sentence, "the sentencing judge not only assures reviewing courts (and the public) that the sentencing process is a reasoned process but also helps

that process evolve. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court." *Id.* at 357–58.

With these sentencing principles in mind, the court now turns to analyze each § 3553(a) sentencing factor.

### 1. Offense and offender characteristics

The Tenth Circuit ultimately determined "[t]his factor points both ways: The nature of the offense weighs strongly against a time-served sentence, and the offender's characteristics could reasonably support leniency." *Walker*, 844 F.3d at 1257. Considering the evidence on remand, the court finds that the nature of the offense remains as serious as ever, while the offender's characteristics continue to support leniency now even more forcefully than at the prior sentencing.

The seriousness of bank robbery certainly weighs against a probationary sentence. No one disputes the gravity of bank robbery and the terror its victims can experience. Some victims in this case expressed their fear during the robbery and the anxiety that has since followed them in public or near construction workers. Mr. Quillen changed positions within the bank to avoid having to work in a role that could escalate to violent situations. None of the victims has sought treatment or counseling, though U.S. Bank did provide a counselor to employees shortly after the event. Ms. Torgerson stated the process of resentencing had brought her experiences from the robbery to the forefront once again, suggesting possible re-victimization. At least one victim was not scared or intimidated, but acknowledged the threat inherent in the act.

The court reiterates that no evidence establishes Mr. Walker had a weapon during the robberies, and armed robbery was not charged or pled here. The court recognizes, however, the

inherent violence and threat in Mr. Walker's two robberies, and the anxiety that continues to follow the victims.

The government reminds the court of Mr. Walker's extensive criminal history to support its analysis of several sentencing factors here, including the offender's characteristics. (*See* Dkt. No. 61, pp. 9-14.) In the government's view, this history demonstrates Mr. Walker is a menace to society and, essentially, a lost cause. Based on the evidence before the court on resentencing, however, Mr. Walker's criminal history does not and cannot account for the characteristics of the individual the court sentences today. The court cannot justify punishment today on the basis of past criminal history for which punishment was meted out and served. Rather, *Pepper* instructs that evidence of post-release conduct "provides the most up-to-date picture of [the defendant's] 'history and characteristics,'" 562 U.S. at 492 (quoting § 3553(a)(1)), and that the court must sentence the defendant "as he stands before the court on the day of sentencing." *Id.* (quoting *Bryson*, 229 F.3d at 426).

The most striking theme discernible from all of the evidence on resentencing is that there are two John Walkers: the old and the new. The dividing line between the two can be pinned rather precisely: Mr. Walker's self-motived enrollment and successful completion of Teen Challenge. The most up-to-date evidence demonstrates Mr. Walker is a wholly different man than his criminal history suggests. After his DUI in April 2014, Mr. Walker self-enrolled in a rigorous treatment program, which required selling his car and cutting off most contact with his family for about a year. Mr. Walker successfully completed Teen Challenge in June 2015 and has been completely clean and sober since, an assertion he has not honestly been able to make for his entire adult life, including the supposed three years of sobriety following incarceration in 2009. He has a stable job with an employer who knows about his criminal and addiction history,

who chose to participate in and trust Mr. Walker's recovery, and who remains impressed with Mr. Walker's accomplishments, work ethic, and character. Mr. Walker married, improved his relationship with his stepdaughter, and often cares for his granddaughter. Mr. Walker volunteers in his community, sharing both his painting skills and his experience with addiction recovery with others struggling to recover as well. Ms. Skinner, Mr. Akers, and Ms. Walker all described Mr. Walker's newly acquired and apparently effective strategies for dealing with life stressors without resort to drugs and alcohol.

Without exception, all those close to Mr. Walker believe he has changed, and all who testified said they see no reason to doubt his sincerity or success at this point. The court finds many similarities between Mr. Walker's rehabilitation and Pepper's, except that Mr. Walker's follows a life-long struggle with addiction and crimes attendant to or supporting that addiction. *Compare Pepper*, 562 U.S. at 492 (finding evidence that Pepper attended a 500-hour drug treatment program and had been drug-free five years, attended college and achieved high grades, was a top employee slated for a promotion, had re-established a relationship with his father, and was married and supporting his wife's daughter constituted "a critical part" of Pepper's history and characteristics).

The government's recitation of Mr. Walker's criminal history omits any reference to drug addiction, which Mr. Walker has struggled with since age ten. Mr. Walker's criminal history, as well as his claim that he has changed and is done robbing banks, is largely incomprehensible without this acknowledgment. As Judge Robert W. Sweet has recognized, "[t]he standard for departure, particularly in the context of long-term addiction, is not an unblemished record, but rather extraordinary progress as measured by all relevant factors." *United States v. Bodden*, No. 01CR.1006(RWS), 2002 WL 1364035, at *2 (S.D.N.Y. June 24, 2002) (unpublished). Mr.

Walker has made much progress in recovering from a lifetime of drug and alcohol addiction. His commitment to successful recovery and to helping others in his community with their recovery was not court-imposed and suggests "the kind of concrete change in attitude, a fundamental shift in behavior, that is extraordinary." *United States v. Perella*, 273 F. Supp. 2d 162, 171 (D. Mass. 2003) (departing downward to a sentence of probation for five years with six months of home detention for a bank robber addicted to opiates who had no other criminal history, achieved "exceptional" progress in beating his addiction, helped others battling addiction, and had positive reports from every professional with whom he interacted).

Thus, while the court finds the nature of the offense weighs against a probationary sentence, the court finds the offender's history in the context of his current characteristics weigh strongly in favor of probation.

### 2. The need for a sentence to reflect the basic aims of sentencing

The court must next consider "the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)–(D). In weighing these factors, the court remains conscious of its duty to "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing as set out above. *Id.* § 3553(a). Once again, evidence of Mr. Walker's rehabilitation "bears directly" on this "overarching duty." *Pepper*, 562 U.S. at 493.

#### a. *"Just punishment"*

As the Tenth Circuit stated, "the length of the sentence should reflect the 'harm done' and 'the gravity of the defendant's conduct.'" *Walker*, 844 F.3d at 1257 (quoting S. Rep. No. 98-225,

at 75 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3258). The court addressed the seriousness of the crime of bank robbery above. While two bank robberies is grave conduct, especially in light of Mr. Walker's history of robbing banks, the harm done in this case is limited primarily to the fear experienced by the victims during the robbery and the anxiety in public that has followed them since.

The Tenth Circuit also noted that this court "did not provide any punitive sanctions for the two bank robberies." *Id.* at 1257. The court turns to this issue while considering the need for just punishment and to promote respect for the law. The court remains cognizant that section 3553(a) does not require "punishment," but it is a factor to be considered and weighed together with the other factors.

The parties disagree on whether punishment contemplates a purpose beyond retribution. When asked about the purpose of the "just punishment" factor, the government argued that no purpose was necessary and that the price to be paid for two bank robberies is incarceration, which would satisfy the punitive element of punishment. (Resentencing tr. 128-29.) Of course, imprisonment is not the only way to exact a just punishment here, because Congress did not set a mandatory minimum for this crime. *See* 18 U.S.C. § 2113(a). Just punishment, including solely for retributive ends, can be accomplished by a set of other sanctions that do not necessarily include incarceration.

The court concludes Mr. Walker has been and will continue to be justly punished. Significantly, the statute directs the court to consider the need for "just punishment," not punishment in and of itself. The fact that the statute modifies "punishment" with the requirement that it be "just" means that punishment must entail the "treatment" that is "deserved or appropriate in the circumstances." *Just*, Oxford Dictionaries Pro,

https://en.oxforddictionaries.com/definition/just (last visited on May 16, 2017). Punishment simply for the sake of punishment, which serves no purpose in correcting the individual being punished or advancing the greater aims of a civil society, can hardly be said to be appropriate under the circumstances and cannot be fairly characterized as "just."

The four years Mr. Walker has spent on pretrial and postsentencing supervised release has included a substantial restriction on his freedom. One of these restrictions was Mr. Walker's year-long attendance of Teen Challenge. Mr. Walker sold his car to pay for the program and had substantial limits on family visits while he was there. The court must consider that Teen Challenge is an intensive and highly successful residential drug treatment program. Mr. Walker's resentencing memorandum includes a summary culled from research conducted by the National Institute of Drug Abuse in 1975 and studies by Northwestern University in 1994 and 1999. (*See* Ex. B, Dkt. No 53-2.) These surveys show that 86% of Teen Challenge graduates, after seven years, remained drug and crime free, in comparison to a 6-7% rate for secular programs and a 15% rate for Ohio state programs, (Resentencing tr. 91); 90% of graduates were employed one and two years later (compared to 41% in secular programs); and 87.5% of graduates did not need further treatment (though 90% reported they were addicts upon entering). (Dkt. No 53-2.) The court does not quote these statistics to imply any consideration of or favoritism for religion, or express any view at all on the religious nature of the program, but simply to note the astounding success of it. While Mr. Walker certainly requested to enter the program, with the court's permission, the court does not find that diminishes Mr. Walker's commitment to a challenging and impactful program, his success in completing it, and his maintenance of a changed mind set and coping skills since. *See Perella*, 273 F. Supp. 2d at 166 (noting that while there is nothing "extraordinary" about attending a drug program, few defendants successfully complete them—

though successful completion alone was not sufficient for a downward departure under the guidelines).

The court rejects the government's assertion that punishment need serve no purpose. "Retribution is a legitimate reason to punish . . . [b]ut 'the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.'" *Graham v. Florida*, 560 U.S. 48, 71 (2010) (quoting *Tison v. Arizona*, 481 U.S. 137, 149 (1987)). The court finds Mr. Walker's life-long addiction relevant, and mitigating, to his personal culpability. Recently, Judge Mark W. Bennett summarized the current scientific evidence on addiction and how it physically changes the brain, concluding: "While '[t]he initial decision to take drugs is mostly voluntary . . . when drug abuse takes over, a person's ability to exert self control can become seriously impaired.' . . . Stated plainly, addiction biologically robs drug abusers of their judgment, causing them to act impulsively and ignore the future consequences of their actions." *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1172–73 (N.D. Iowa 2014) (quoting Nora D. Volkow, *Preface* to National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction 1 (2010), http://www.drugabuse.gov/sites/default/files/sciofaddiction.pdf). Judge Bennett posits that the scientific consensus on addiction presents a fundamental issue at sentencing when considering retribution, or, more specifically, punishment proportionate to culpability. *Id.* at 1173–74. Judge Bennett finds that addiction will often mitigate a defendant's culpability, which can weigh in favor of a downward variance. *Id.* at 1174–76. He explains:

> By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences. This is certainly true for Hendrickson, whose criminal history coincides with, and directly relates to, periods of drug abuse.

> During allocution, in a moment of self-reflection, Hendrickson noted that "drugs clouded my mind and motivated me to do things I would never do had I been sober." Hendrickson, therefore, acknowledges that drugs diminished his capacity to make good decisions.

*Id.* at 1174. This court agrees with Judge Bennett's thoughtful analysis of addiction and culpability, and agrees that there are "fundamental differences between the addict and non-addict brain." *Id.* at 1175. The court finds the circumstances here support some mitigation in Mr. Walker's case, as Judge Bennett found they did in Hendrickson's. First, Mr. Walker has abused alcohol and marijuana since at least age ten and was addicted to methamphetamine by his twenties. He is now 57 years old and, by his own admission, has only been fully clean and sober for the most recent three years of his life. He used drugs and alcohol during a critical developmental period for his brain, and he candidly admitted at resentencing that when he has used drugs, he has robbed banks. The government argues that the real driver and motive for the robberies in this case was Mr. Walker's financial hardship, but the evidence, including testimony by Mr. Brimley, Ms. Torgerson, Mr. Walker, and Ms. Walker, strongly supports that Mr. Walker had relapsed on drugs prior to committing the robberies. Mr. Walker's addiction must be considered in crafting a punishment proportionate to his culpability.

The court also finds that a lengthy prison sentence would not promote respect for the law in these circumstances. Mr. Walker's probation officer testified that a custody sentence would not be beneficial in Mr. Walker's case, and Mr. Walker's mental health counselor agreed. In the abstract and generally speaking, the court understands Mr. Bentley's belief that "the justice system is failing in protecting citizens" if someone can rob banks and be released "within a few years." (Victim Impact Statement, Dkt. No. 62.) At the resentencing hearing, however, the two victims who remained to hear all the evidence were asked to opine on what prison sentence was appropriate here. Understandably, neither victim directly addressed that difficult issue, and only

one spoke. He simply reiterated that he was in fear during the robbery and had since changed

positions within the bank. (*See* Resentencing tr. 106-08.) Though the question of what sentence

Mr. Walker receives remains this court's decision, upon following the proper sentencing

analysis, the court finds the victims' statements (or lack thereof) relevant here.

In *Gall*, the Supreme Court recognized that where cases present unusual or unique

postsentence conduct, "a sentence of imprisonment may work to promote not respect, but

derision, of the law if the law is viewed as merely a means to dispense harsh punishment without

taking into account the real conduct and circumstances involved in sentencing." 552 U.S. at 54

(quoting the district court below). Moreover, the Supreme Court emphasized that probation *is*

punishment:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id.* at 48. This court would add that violations of probation can result in a defendant being

resentenced as if he had committed the crime anew. *See* 18 U.S.C. § 3565(a); *United States v.

Sanchez*, 907 F.2d 127, 128 (10th Cir. 1990) ("Revocation of probation . . . allows the court to

set a new sentence for the original conviction."). Probationary sentences accord flexibility to the

courts because they can be revoked at any time upon a hearing and consideration of the general

statutory sentencing provisions. *See* 18 U.S.C. § 3565(a). Upon revocation, the court may

"impose any term of imprisonment that was available at the initial sentencing proceeding."
*United States v. Jones*, 449 F. App'x 767, 769 (10th Cir. 2011) (unpublished); *see also United States v. Kippers*, 685 F.3d 491, 499 (5th Cir. 2012) (noting "leniency at the original sentencing generally may justify a harsher revocation sentence"). Moreover, where a defendant is found to have possessed a controlled substance during probation, a court is *required* to revoke probation and impose a term of imprisonment. *Id.* § 3565(b).

On the whole, the court finds the seriousness of Mr. Walker's crime would support a custody sentence, but that "just punishment" does not weigh in favor of a custody sentence where a long term of probation and a period of home confinement is sufficient, but not greater than necessary, to fulfill retributive purposes. Moreover, in light of Mr. Walker's post-plea conduct, the court finds that a lengthy custody sentence would not promote respect for the rule of law in this case.

### b. Deterrence

Under section 3553(a)(2)(B), the court is to consider the need to deter the defendant and others. *Walker,* 844 F.3d at 1257. The Tenth Circuit found this court's prior conclusion that imprisonment was unnecessary to deter Mr. Walker reasonable. *Id.* The court again finds Mr. Walker is not currently a threat to the public and that the evidence shows no further need to deter him.

"[E]xemplary postsentencing conduct may be taken as the most accurate indicator of '[a defendant's] present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him.'" *Pepper*, 562 U.S. at 492–93 (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). Mr. Jones, Mr. Walker's probation officer, reports that Mr. Walker has been compliant with all terms of supervised

release for the past three years, both before and after the prior sentencing. Mr. Walker stresses that he has changed, and that the "old," drug-addicted John Walker is finally gone. Evidence from every person around Mr. Walker, from his family to his community to his mental health counselor and probation officer, uniformly and amply supports this conclusion. The court can very clearly tie Mr. Walker's self-rehabilitation to an identifiable source (Teen Challenge) that is extremely successful at producing individuals who remain clean and sober. Twenty years of prison sentences failed to accomplish the deterrence achieved by a self-motivated defendant and a tough, yet effective treatment program.

Even if the court were not to accept Mr. Walker's representations—though the court can find no evidence to undercut them—and the government is correct that only a looming prison sentence motivates Mr. Walker's recovery and good behavior, such logic suggests that a probation sentence with looming prison time upon any violation would more effectively and efficiently effect the purposes of deterrence. Incarceration, on the other hand, would appear to undermine that self-motivated recovery and may even increase the likelihood of Mr. Walker's reoffending in the future.

Studies reviewed by the Office of Justice Programs at the National Institute of Justice (NIJ) concluded that prisons can exacerbate, not reduce, recidivism:

> [C]ompared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects.

Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, United States Department of Justice (May 2016), https://nij.gov/five-things/pages/deterrence.aspx [hereinafter NIJ, *Five Things*] (quoting Daniel S. Nagin, Francis T. Cullen & Cheryl Lero Johnson, *Imprisonment and Reoffending*, Crime and Justice: A Review of Research, vol. 38,

(2009)).[9] The NIJ also notes that age is a powerful factor in deterring crime and that criminals naturally age out of crime. *Id.* (citing Robert J. Sampson, John H. Laub, and E.P. Eggleston, *On the Robustness and Validity of Groups*, 20 Journal of Quantitative Criminology 1, 37-42 (2004)). The Sentencing Commission's research shows that the two factors most closely associated with recidivism rates (criminal history and age) point in opposite directions here: the higher the offender's criminal history points and criminal history category, the higher the rate of recidivism (80.1% rearrest rate for category VI offenders); meanwhile, the older the age of the offender, the lower his or her recidivism rate (24.7% rearrest rate for individuals age 51-60 years). *See* U.S.S.C., *Recidivism Among Federal Offenders: A Comprehensive Overview*, Parts II & IV (March 2016), http://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview [hereinafter *Recidivism*]. Mr. Walker is in the highest criminal history category, but among the oldest groups of offenders. The data do not appear to have been analyzed to determine the correlation, if any, *between* age and criminal history category. Thus, the data do not permit a conclusion about what the recidivism rate is for men ages 51 to 60 who are also in criminal history category VI.

The Sentencing Commission also found that half of offenders (including career offenders) were rearrested in less than two years following their initial release from prison or placement on probation, and that fewer individuals were rearrested in each subsequent year following release. *Id.* at Part IV ("General Recidivism Rates"); U.S.S.C., *Report to the Congress: Career Offender Enhancements*, (July 2016), at 40, http://www.ussc.gov/research/congressional-reports/2016-report-congress-career-offender-enhancements [hereinafter *Career Offender*]. Mr.

---

[9] The NIJ notes that the "[o]pinions or points of view expressed on this site represent a consensus of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice." *Id.*

Walker is now going on four years without rearrest. Approximately 4.7% of offenders are rearrested in their fourth year following release. *Recidivism* at Part IV ("General Recidivism Rates"). But Mr. Walker is categorized as a career offender, and the Commission noted that career offenders and armed career criminals have a higher rearrest rate than other offenders (69.5% compared to 48.7%) and that offenders committing robbery are some of the most likely to be rearrested (67.3%). *Id.* ("Recidivism and Criminal History").

These data, while conflicting, confirm that Mr. Walker has a greater risk of reoffending than most, a reality also substantiated by his history of addiction and criminal history. There is also evidence in the record, however, that contradicts these statistics. Mr. Jones testified that Mr. Walker's PCRA measures him at a low to moderate risk of recidivism and that Mr. Walker's criminal history, because it is a static factor, may be keeping him at that level. In addition, Mr. Walker's enormous recovery and demonstrated changes in mindset and behavior strongly suggest Mr. Walker has finally broken the iterative loop of addiction-crime-incarceration and that sending Mr. Walker back to prison for another ten years will not achieve any deterrent effect at this point. The Commission found that offenders sentenced to probation had a lower rearrest rate than those sentenced to imprisonment (35.1% compared with 52.5%), while the highest recidivism rates were associated with offenders receiving longer sentences. *Id.* ("Recidivism and Sentences Imposed").[10] While a term of incarceration will certainly incapacitate and punish Mr. Walker, the court finds that it will do little to deter Mr. Walker from committing future robberies and may actually precipitate a relapse into addiction and crime. *See* NIJ, *Five Things* ("Prison is

_____

[10] Of course, the Commission recognized that the correlation between sentence type and length and recidivism was not necessarily coincidental because those receiving longer terms of incarceration as a result of their higher criminal history category are also at a greater risk of recidivism, and those receiving no incarceration or a short term of incarceration generally had a lower criminal history category. *Id.*

an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes.").

Additionally, the court finds Mr. Walker's improved familial relationships and relationships with his community also support the lack of any need to further deter Mr. Walker at this point. Studies show that supportive family connections predict reduced recidivism, while breaking up families leads to increased recidivism. Kimberly Bahna, *"It's a Family Affair"* – *The Incarceration of the American Family: Confronting Legal and Social Issues*, 28 U.S.F. L. Rev. 271, 275 (1994) ("Research has shown that the disruption in family ties during incarceration actually *increases* the criminal behavior of ex-inmates."); Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99–100 (2002) ("[A]lthough family ties do not guarantee success after release, the absence of such ties increases the likelihood of failure. The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."). Courts have considered family ties important to sentencing decisions. In the Commission's 2010 survey of United States district judges, 62% said that family ties and responsibilities are "ordinarily relevant" to the consideration of a departure or variance. U.S.S.C., *Results of Survey of United States District Judges January 2010 through March 2010*, Table 13 (June 2010), http://www.ussc.gov/research-and-publications/research-projects-and-surveys. In 2003, a majority of district court judges surveyed indicated that more emphasis was needed on (1) age; (2) mental condition; and (3) family ties and responsibilities. *See* Linda Drazga Maxfield, Office of Policy Analysis, U.S.S.C., *Final Report: Survey of Article III Judges on the Federal Sentencing Guidelines*, Chapter II B. 2. (Mar. 2003), http://www.ussc.gov/research/

research-and-publications/research-projects-and-surveys/survey-article-iii-judges-federal-sentencing-guidelines.

In sum, the court finds incarcerating Mr. Walker and removing him from the strong system of support and accountability that he has built around himself would not measurably deter him and would more likely cause a backslide into relapse, and thus further criminal conduct, than a probationary sentence. *See United States v. Rodriguez*, 724 F. Supp. 1118, 1119 (S.D.N.Y. 1989) ("The imposition of a year's jail sentence would serve no end, but ritualistic punishment with a high potential for destruction. Indeed, putting the defendant in jail for a year would be the cause most likely to undo his rehabilitation.").

But individual deterrence is only one side of the deterrence analysis. Sentencing courts need also consider the deterrent effect a sentence of incarceration for this crime will have on others. As the Tenth Circuit noted, "[g]eneral deterrence . . . is one of the key purposes of sentencing . . ." *Walker*, 844 F.3d at 1257 (quoting *United States v. Medearis*, 4551 F.3d 918, 920 (8th Cir. 2006)); *see also Untied States v. Milo*, 506 F.3d 71, 76 (1st Cir. 2007) ("The need to deter others is under federal law a major element in criminal sentencing."). Beyond these general statements, however, the court finds the recent research shows general deterrence is more effectively accomplished in circumstances already addressed in, or less applicable to, this case.

Because theories of deterrence involve the attempt to induce crime-eschewing behavior in response to the threat of punishment, researchers (and courts) have attempted to better understand the circumstances in which deterrence is and is not effective. The NIJ, culling from Professor Nagin's 2013 article summarizing the current state of theory and empirical knowledge about deterrence, states that sending a convicted individual to prison is not a very effective way to deter crime and that increasing the severity of punishment does little to deter crime. *See* NIJ,

*Five Things*. Nagin states the conclusion more precisely: is it the "*certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension" that is a more effective deterrent. Daniel S. Nagin, *Deterrence in the Twenty-First Century*, Crime and Justice in America: 1975-2025, at 202 (2013) [hereinafter *Deterrence*]. Nagin also concludes that "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs." *Id.* at 201. Inherent in this statement, as the NIJ and the government also point out, is that short to moderate prison sentences may still be a deterrent. But "it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis." *Id.* at 202.

These conclusions acknowledge at least some delusion in the concept that severe punishment effects general deterrence. The court does not doubt that incarceration has some general deterrent effect; however, this effect does not work on the level of precision that a sentencing court must in crafting sentences that truly effectuate sentencing purposes. For example, would the public, including would-be defendants, be more deterred by a sentence of 12 months incarceration, or 60 months, or 120 months? Most of the public is unaware of how harsh federal sentences can be, which suggests that the incremental severity of sentence does not act as an effective general deterrent. *See* Nagin, *Deterrence* at 204 ("Not surprisingly, the surveys find that knowledge of sanction regimes is poor. . . . [F]or individuals for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration."). According to Nagin, the more effective general deterrence comes from better visibility of policing, which increases certainty of punishment, rather than increasing the severity of punishment on the back end. *See id.*at 201, 252–53.

Moreover, current theories of deterrence are inconclusive on the differential deterrent effects of different sanctions, e.g., imprisonment versus probation. *See id.* at 253 ("Theories of deterrence, however, specify sanction threats in the singular, not in the plural. Theories of deterrence that conceive of sanctions in the singular do not provide the conceptual basis for considering the differential deterrent effect of different types of sanction options."). Nagin concludes that lengthy prison sentences can only be justified on retributive grounds:

> [These conclusions] suggest that lengthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds. The crime prevention efficiency of incapacitating aged criminals is dubious, and thus the case for lengthy prison sentences must rest on retributive considerations.

*Id.* If the general deterrent effect of different sanctions is indeterminate, and lengthy imprisonment simply calls back the purposes of retribution, the court cannot reasonably conclude that a lengthy term of imprisonment in this case will effectuate the specific purpose of general deterrence.

Finally, courts recognize that general deterrence is more effective in certain contexts. In *United States v. Musgrave*, 761 F.3d 602, the Sixth Circuit identified white-collar crime as "especially susceptible to general deterrence." *Id.* at 609. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Id.* (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)). As discussed previously, addiction induces irrational behavior, and robbery is a particularly irrational crime. "[S]everity of punishment clearly continues to have some deterrent effect—albeit less than it would were the universe of potential criminals an overall rational bunch." *United States v. Courtney*, No. CR 11–2860–001 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014) (citing Daniel S. Nagin, *Deterrence: A Review*

*of the Evidence by a Criminologist for Economists*, 2013 Annual Rev. Econ. 5:83, 86–88, 97–98 (2013)). Drug-addicted bank robbers are a less-than rational bunch,[11] and the court finds the effect on general deterrence of sending Mr. Walker away for a lengthy period of incarceration is marginal in this context. Neither Mr. Walker's crime nor his sentence is likely to be highly publicized. The chance that a would-be bank robber would learn of Mr. Walker's sentence of probation and, by that information, be less deterred from robbing a bank, thinking he would only receive a sentence of probation, is so remote as to defy any meaningful conclusion that this case requires a longer, custody sentence.

Consideration of general deterrence "becomes particularly important when the district court varies substantially from the sentencing guidelines." *Walker*, 844 F.3d at 1258. The court has considered general deterrence and finds the evidence is, at best, inconclusive as to whether a lengthy term of imprisonment of Mr. Walker would provide any deterrent effect. Matched with the finding that there is no need for specific deterrence in Mr. Walker's case, the court finds that the purposes of deterrence are well-served by a probationary sentence.

### c. Incapacitation

The Tenth Circuit noted that this court did not mention this factor during the prior sentencing and stated that "[t]he value of incapacitating Mr. Walker further supports incarceration." *Walker*, 844 F.3d at 1258. Of course, "[i]ndividuals behind bars cannot commit

---

[11] *See, e.g.*, Guyora Binder, *The Culpability of Felony Murder*, 83 Notre Dame L. Rev. 965, 984 (2008) (noting that Criminologist Jack Katz's research on armed robbers demonstrates that robbers' "crimes are sometimes impulsive and are often pursued for expressive rather than instrumental reasons" and reasoning that "[i]f robbers act against their own welfare to enact a role or claim a reputation, they are unlikely to be unusually responsive to deterrent threats"); Franklin E. Zimring & Gordon Hawkins, *Is American Violence A Crime Problem?*, 46 Duke L.J. 43, 55 (1996) (discussing the high arrest rates for bank robbery and low cash reward, and concluding that "[o]n a risk-reward basis, no crime against property makes less sense in the United States than robbery").

additional crime – this is incarceration as incapacitation." NIJ, *Five Things*. But Mr. Walker is currently on release and has worked to conquer the drug abuse that he acknowledges precipitates his criminal activity. Probation Officer Jones opined that Mr. Walker has shown he is amenable to and compliant on supervision. Therefore, in the circumstances of this case, incapacitation is intertwined with considerations of specific deterrence—that Mr. Walker "may fear incarceration and thus refrain from committing future crimes." *Id.* The court has found that lengthy imprisonment would not deter Mr. Walker at this point, a conclusion the Tenth Circuit found reasonable. *See Walker*, 844 F.3d at 1257.

The government argues that Mr. Walker would at least be incapacitated for the ten-year period of incarceration, but the court is satisfied that a probation sentence will incapacitate Mr. Walker for far longer. Even if the court were to impose the government's requested sentence, Mr. Walker will eventually be released. Rhetorically, will Mr. Walker be more or less likely to reoffend after ten years in prison, or after ten years of probation? Twenty years of imprisonment certainly incapacitated Mr. Walker for that length of time, but only that length of time. Mr. Walker's most recent period of supervised release, particularly after April 2014, demonstrates that he can be incapacitated efficiently and effectively, and for the long-term, *without* imprisonment.

### d. Rehabilitation

The court finds that Mr. Walker's continued rehabilitation will be more supported by a sentence of probation than incarceration at this time. Incarceration could not provide Mr. Walker with needed educational or vocational training or other treatment that would be more effective than that he has already undertaken. Moreover, probation will allow Mr. Walker to continue and to strengthen his recovery in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D).

### 3. The sentences legally available

As noted above, Congress did not impose a mandatory minimum sentence for bank robbery. *See* 18 U.S.C. § 2113(a). Mr. Walker's counsel, Mr. Bridge, noted during the resentencing hearing that Mr. Walker pled guilty to two counts of bank robbery and each carries up to 20 years imprisonment with one to three years of supervised release following. *See id.* & § 3583(b)(2). If the court imposes a probation sentence, Mr. Walker could receive up to five years of probation on each count. *See id.* § 3561.

### 4. Sentencing Commission Guidelines

The Tenth Circuit noted the Guidelines recommend 151 to 188 months imprisonment and found that this court "could vary downward, but here it varied down all the way to time served— 33 days in pretrial detention—which amounted to 0.718% of the bottom of the guideline range." *Walker*, 844 F.3d at 1258. Thus, it concluded that the Guidelines weighed against a time-served sentence.

While the Tenth Circuit applies a rebuttable presumption of reasonableness to a sentence on appeal that falls within, and sometimes below, the applicable guideline range, *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011), district courts apply no presumption of reasonableness to the guideline range. *See Rita*, 551 U.S. at 351 (noting "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"). "[A] district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46.

The Guidelines take Mr. Walker's long criminal history into account by recommending 151 to 188 months of incarceration, and the court remains "cognizant of them throughout the

sentencing process." *Gall*, 552 U.S. at 50 n.6. The court recognizes that the Guidelines weigh against a probationary sentence, as they do in most cases that come before this court. While the appellate court may consider the degree of a variance and extent of a deviation from the Guidelines, *Id.* at 47, to qualify the variance in terms of a percentage of the Guideline range is misleading and even problematic when reviewing probation sentences. The *Gall* court recognized that

> [t]he mathematical approach also suffers from infirmities of application. On one side of the equation, deviations from the Guidelines range will always appear more extreme—in percentage terms—when the range itself is low, and a sentence of probation will always be a 100% departure regardless of whether the Guidelines range is 1 month or 100 years.

*Id.* at 47–48; *see also United States v. Jones*, No. 16-5036, 2017 WL 405615, at *3 (10th Cir. Jan. 31, 2017) (unpublished) (acknowledging *Gall*'s rejection of "a rigid mathematical formula" that assesses a sentence based on the percentage it varies, and affirming as substantively reasonable a 300% increase from the guideline range based on the district court's weighing of several § 3553(a) factors). Of course, a probationary sentence is a substantial, nearly 100% variance from the Guideline range in this case, and the Guideline range here is substantially greater than that in Mr. Gall's case. But proportional comparisons will always be drastic for probationary sentences.

The Supreme Court has noted that "the Commission fills an important institutional role: it has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007)). While the Guidelines aim to carry out the "same basic § 3553(a) objectives" as the sentencing judge, courts have recognized the difficulties in resolving the conflicts inherent in the sentencing objectives

and determined that the Guidelines reflect an uneasy, "rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. As approximations, the Guidelines can over- and underestimate a given sentencing factor in an individual case. At least one court has recognized that the Guidelines do not—indeed, cannot—account for relevant offender characteristics besides criminal history. *See Rodriguez*, 724 F. Supp. at 1120 ("Offender characteristics have been virtually excluded from the guideline grid calculation leading to the presumptive sentence. The only aspect of offender characteristic having any significant effect is the offender's history of prior convictions, which governs the Criminal History Category.").

In the context of career offenders, studies show that courts are varying more and more from the Guidelines. Recently, the Commission has noted that career offenders are increasingly receiving sentences below the guidelines range, primarily at the government's request, but also at the court's initiative. *See Career Offender* at 22 ("During the past ten years, the proportion of career offenders sentenced within the applicable guideline range has decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014."). The Commission reported that 22.8% of violent crimes were sentenced below the guideline range without government sponsorship. *Id.* at 35. Excluding drug trafficking, robbery constituted the most serious, common prior offense among career offenders for violent crimes (11.6%). *Id.* at 19, 30. And virtually all career offenders received sentences of imprisonment (99.5%), with an average sentence of 147 months. *Id.* at 24.

The court recognizes the Guidelines are intended to capture the collective experience of the Commission and finds that the Guideline range in this case weighs heavily against a probationary sentence. But the Supreme Court has observed that "the Guidelines are only one of the factors to consider when imposing sentence, and [18 U.S.C.] § 3553(a)(3) directs the judge to

consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. The Guidelines remain in tension with the admonition that the sentencing court must consider each case as unique and sentence the individual who appears before it on the day of sentencing, and not merely the crime committed.

Ultimately, the court is left to weigh and balance the sentencing factors, and some factors will necessarily weigh more heavily than others in an individual case. *See id.* at 57 (stating that it was not unreasonable for the sentencing judge to attach "great weight" to a single consideration when the circumstances merited such weight). "Even where the judge varies from the recommended range, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense a basis for the sentence." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion) (citation omitted).

### 5.     Sentencing Commission policy statements

The parties have not presented the court with any relevant policy statements from the Sentencing Commission. The court and the parties have discussed recent research by the Commission pertinent to the basic aims of sentencing, and some relevant findings have been addressed above.

### 6.     The need to avoid unwarranted sentencing disparities

The Tenth Circuit found that Mr. Walker's previous time-served sentence created an unwarranted sentencing disparity. *Walker*, 844 F.3d at 1258. The Circuit was concerned that Mr. Walker had not identified "a single case in which a career offender or convicted bank robber received a sentence of 33 days (or a comparable period)," when the government had identified bank robbery sentences that were far longer. *Id.* at 1259.

The Guidelines aspire to avoid sentencing disparities among similarly situated defendants who engage in similar criminal conduct regardless of the location of the crime. *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015). Thus, when a district judge "correctly calculate[s] and carefully review[s] the Guidelines range, he necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall*, 552 U.S. at 54. "While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record." *United States v. Shaw*, 471 F.3d 1136, 1140 (10th Cir. 2006) (quoting *United States v. Goddard*, 929 F.2d 546, 550 (10th Cir. 1991)). "And § 3553(a)(6)'s consideration of unwarranted sentence disparities is but one factor that a district court must balance against the other § 3553(a) factors in arriving at an appropriate sentence." *United States v. Lente*, 759 F.3d 1149, 1168 (10th Cir. 2014) (quoting *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010)).

On resentencing, Mr. Walker has identified 43 judgments from various district courts in which bank robbers received sentences of time served, supervised release, or probation. (Dkt. No. 57.) Unfortunately, these judgments do not assist the court in resolving the issue of sentencing disparity because the documents do not disclose the defendants' offense levels, criminal histories, or the specifics of the offenses. Without this information, this court cannot determine whether the other sentences involved similar circumstances or, if they did, whether the disparities were warranted. *Franklin*, 785 F.3d at 1373.

The government provides the court with 14 career offender robbery cases, of varying resemblance and applicability to this case, in which appellate courts affirmed sentences of similar or much greater terms of imprisonment than the 120 months requested. "'No two cases are identical,' and comparison of 'an individual sentence with a few counsel-selected cases

involving other defendants sentenced by other judges is almost always useless.'" *Franklin*, 785

F.3d 1365, 1372 (10th Cir. 2015) (first quoting *Lente*, 759 F.3d at 1171, then quoting *United*

*States v. Scherrer*, 444 F.3d 91, 95 (1st Cir. 2006)). Moreover, the problem with the

government's and Mr. Walker's cited cases is that it is almost impossible to determine the unique

and individualized circumstances that guided the courts in imposing sentences in those cases.

Without those critical details, any comparison is meaningless.[12] However, because of the posture

of this case, the court will address these cases.

Of cases cited by the government, six involve defendants subject to higher or unidentified

guideline ranges. *See United States v. Jackson*, 604 F. App'x 821 (8th Cir. 2015) (unpublished)

(guideline range not identified); *United States v. Sim*, 556 F. App'x 726 (10th Cir. 2014)

(unpublished) (168 to 210 months); *United States v. Haire*, 441 F. App'x 199 (4th Cir. 2011)

(unpublished) (188 to 235 months); *United States v. Pearson*, 308 F. App'x 375 (11th Cir. 2009)

(unpublished) (guideline range not identified); *United States v. Ellis*, 525 F.3d 960 (10th Cir.

2008) (guideline range not identified); *United States v. French*, 304 F. App'x 968 (3rd Cir. 2008)

(unpublished) (360 months to life imprisonment).

Seven cases involved convictions for several additional crimes or a concurrent violation

of supervised release. *See United States v. Bartley*, 618 F. App'x 439 (10th Cir. 2015)

(unpublished) (affirming 151-month sentence for bank robbery and supervised release violation);

*United States v. Jackson*, 604 F. App'x 821 (8th Cir. 2015) (unpublished) (affirming 294-month

sentence for bank robbery and brandishing a firearm during a crime of violence); *Sim*, 556 F.

---

[12] An additional issue adheres to the cases cited by the government. The cases in which a
defendant appeals a sentence that varies above the guideline range, or is arguably greater than
necessary to achieve sentencing purposes, and the appellate court affirms the sentences as
substantively reasonable cannot illuminate whether a district court properly exercises its
discretion by varying substantially below the guideline range, as in this case.

App'x at 730–31 (affirming 234-month sentence for bank robbery and supervised release violation); *Haire*, 441 F. App'x at 200 (affirming 300-month sentence for twenty-three counts of bank robbery); *United States v. Phelps*, 454 F. App'x 551 (9th Cir. 2011) (unpublished) (affirming 151-month sentence for six counts of bank robbery and supervised release violation); *Pearson*, 308 F. App'x at 376 (affirming 564-month sentence for two counts of armed bank robbery, brandishing a firearm during a crime of violence, and being a felon in possession of a firearm); *French*, 304 F. App'x at 969 (affirming 300-month sentence for several charges arising from an armed robbery of a restaurant).

Three cases contained insufficient analysis of the substantive unreasonableness challenges for the court to determine their relevance here. *See United States v. Carney*, 570 F. App'x 91 (2d Cir. 2014) (unpublished) (affirming 100-month sentence for conspiracy and bank robbery); *United States v. Eason*, 643 F.3d 622 (8th Cir. 2011) (noting simply that the sentencing court weighed "mitigating circumstances" argued at the hearing against the seriousness of four bank robberies in a one-year time span and defendant's "long history of crimes and substance abuse"); *Pearson*, 308 F. App'x at 379–80 (restating sentencing principles in affirming the sentence). One case does not even appear to include a substantive unreasonableness challenge on appeal. *United States v. Williams*, 559 F.3d 1143, 1144 (10th Cir. 2009) (rejecting challenge to the district court's finding that defendant's prior conviction for battery on a police officer qualified as a "crime of violence" under § 4B1.2).

And eight cases contain worse facts than present on this record and/or no evidence of extensive rehabilitation. *See United States v. Patterson*, 615 F. App'x 594, 597 (11th Cir. 2015) (unpublished) (defendant sentenced to 120-months for bank robbery; court found "some variance" warranted for defendant's troubled childhood and his obtaining a GED and job, but

noted the seriousness of bank robberies and defendant's criminal history, including 20 convictions over a 15-year period for serious criminal acts such as aggravated battery, burglary, robbery with a weapon, grand theft of a motor vehicle, dealing drugs, and possessing a loaded firearm as a convicted felon); *Bartley*, 618 F. App'x at 441, 443, 447 (defendant robbed bank two months after being released from prison and while on supervised release; district court found "no indication he would stop committing bank robberies when released"); *Jackson*, 604 F. App'x at 823 (defendant argued for leniency based on his current stability and family support, but court found sentence supported by the fact that the armed robbery "put the lives of bank employees at risk," that he committed the offense while on supervised release, and that his extensive criminal history included many violent crimes); *Sim*, 556 F. App'x at 731 (defendant robbed two banks on the day he was released from prison for a previous bank robbery); *United States v. Woods*, 529 F. App'x 614, 616–18 (6th Cir. 2013) (unpublished) (defendant pled guilty to bank robbery and aiding and abetting bank robbery just two months after his release; court distinguished defendant's violent criminal record from co-defendants, noting defendant's record "involved a pattern of violent, armed crime, which resulted in the shooting death of one victim and the stabbing of another"); *Phelps*, 454 F. App'x at 552–53 (defendant pled to six counts of bank robbery and violations of supervised release and parole, and had committed at least 13 bank robberies between 1981 and 2009, including threats of violence during commission of the crimes); *United States v. Richmond*, 421 F. App'x 791, 793–95 (10th Cir. 2010) (unpublished) (defendant committed bank robbery while on parole from an assault conviction by handing teller a note reading "I have a bomb"; court rejected defendant's arguments to vary from the career-offender guideline range due to his age, cocaine addiction, and impulsive crime because of his lengthy criminal history and emphasizing that "it's pretty much a rol[l] of the dice whether he's

going to deal with his drug problem"); *Ellis*, 525 F.3d at 962–63, 965 (defendant organized and persuaded another to commit the bank robbery, drafted a demand note including a death threat, and had prior convictions for robbery with firearms and escape from a penal institution).

The Tenth Circuit also highlighted its precedent in *United States v. Friedman*, 554 F.3d 1301 (10th Cir. 2009), and determined that Mr. Walker's 33 days in pretrial detention involved less than 2% of the prison time meted out to the *Friedman* defendant. *Walker*, 844 F.3d at 1259. The Supreme Court's caution in *Gall* about rigid formulas and calculating percentage variances from the guideline range seems equally relevant in the context of review of other sentences. Despite the disparate prison time meted out between Mr. Friedman and Mr. Walker, the court finds the different sentences thoroughly explained by the different records and circumstances present in the cases.

The *Friedman* court commented several times that "the very limited nature of the record and the paucity of reasoning on the part of the district court most certainly bear on our review of the substantive reasonableness of Friedman's sentence." 554 F.3d at 1312. The Tenth Circuit expressed concern at the lack of any explanation by the district court for why it treated Mr. Friedman "as if he were not a career offender despite his overwhelmingly extensive criminal history." *Id.* at 1308 n.10. The district court did not state any disagreement with the policies underlying the career offender guideline, U.S.S.G. § 4B1.1. *Id.* at 1311. The Tenth Circuit noted that the district court's sentence of 57 months (94 months below the guideline range) was based on a "hunch" that Friedman would change when "simply nothing" in the "admittedly limited record" supported that Friedman would do anything but continue "committing crime after crime after crime." *Id.* at 1308 n.11. Moreover, the district court did not discuss any "programs available to Friedman which could take the place of long-term incarceration and/or minimize the

likelihood of further recidivism on the part of Friedman," so treatment and rehabilitation could not have been a basis for the sentence. *Id.* at 1312. The Tenth Circuit concluded that "there is simply nothing in the record regarding Friedman's personal characteristics indicating leniency of the magnitude granted by the district court in this case was appropriate." *Id.* at 1309.

This court notes that Mr. Walker's case departs from *Friedman* based on the extensive record created here detailing the crimes at issue, Mr. Walker's exceptional recovery and conduct on four years of supervised release, and this court's reasoning for varying substantially from the Guideline range to a probationary sentence. But the cases are distinguishable on their facts and circumstances as well.

Like Mr. Walker, Mr. Friedman had an extensive criminal history, was convicted of bank robbery, and was subject to the same recommended guideline range—but the similarities end there. Between his juvenile and adult convictions, Mr. Friedman's crimes included burglaries, assault with a deadly weapon, vehicle thefts, bank robberies, attempted escape, damage to a jail, vehicle theft, conspiracy to escape, assault with a deadly weapon, making a false claim against the government, and being a felon with a weapon. *Id.* at 1309. Whereas Mr. Walker's crimes are consistent with, and made intelligible by, his lifetime battle with addiction—bank robbery (both armed and unarmed), felony drug possession charges, and misdemeanor DUI/intoxication charges—there was no evidence that Mr. Friedman had issues with drug or alcohol abuse. In forty-five years, Mr. Friedman remained free from prison for only twenty months. *Id.* Mr. Friedman failed to accept full responsibility for his actions, instead blaming the "system" and demonstrating an "inability to grasp the impact of his virtually uninterrupted pattern of violent criminal conduct." *Id.* In short, the record on review in Mr. Friedman's case revealed only "a recidivist bank robber and general criminal." *Id.* at 1312.

The record in this case shows Mr. Walker is not simply a recidivist bank robber and general criminal, though he has admitted to over a dozen bank robberies and other drug crimes. The evidence convincingly ties Mr. Walker's criminal behavior to his drug addiction, and convincingly shows that Mr. Walker has finally received treatment that has allowed him to move past his addiction, while building stronger ties to his family, his community, and his employment. Mr. Walker has already succeeded on pretrial and postsentence supervised release for four years. Mr. Walker has shown remorse for his crimes and has not avoided accountability for their effects at any point since his arrest in May 2013. At the resentencing hearing, Mr. Walker turned to face the victims in the room and apologized to them directly. At age 57, Mr. Walker has finally learned and committed to strategies to control his addiction and be a productive member of society. Mr. Walker's sentence here may create a disparity with Mr. Friedman's sentence, but the court sees more than adequate grounds in this record to justify the disparity.

"Though nationwide disparities are appropriate considerations, they are not always dispositive. Even when national disparities exist, the sentence may remain substantively reasonable if other factors justify the sentence or the disparity is explainable on the existing record." *See Franklin*, 785 F.3d at 1371 n.4 (noting also that a "sentence may be substantively reasonable even when disparities are *unwarranted*") (emphasis added). The court recognizes that this case may create what appears to be a disparity when compared to other career offenders sentenced for bank robbery. But because the court must sentence the offender and not just the crime, the court concludes that, when it takes the other sentencing factors into account, the disparity is warranted in this case. *See Lente*, 759 F.3d at 1169 ("Our sentencing scheme seeks to eliminate not all sentencing disparities, but only 'unwarranted' disparities." (quotation omitted)).

### 7. The need for restitution

While the Tenth Circuit determined restitution was not at issue on appeal, *Walker*, 844 F.3d at 1259, the court did impose restitution of $3,695.50 in its prior sentence. Since the original sentencing, Mr. Walker has consistently made his monthly restitution payments. (Dkt. No. 53, p. 1.) On April 24, 2017, the Probation Office indicated that Mr. Walker had paid the special assessment and that a restitution balance of $1,595.50 remained. The court notes that sentencing Mr. Walker to a period of incarceration would interrupt those consistent restitution payments and prolong the completion of restitution. More specifically, under the current payment schedule of $125 per month, to which Mr. Walker has adhered without fail, restitution will be fully satisfied by May 18, 2018 (approximately 12.8 months or 389 days from April 24, 2017). If Mr. Walker were incarcerated for 120 months, his restitution payment schedule would be reduced to $25 per quarter during imprisonment, elongating the completion of restitution to at least September 17, 2027 ($1,000 during the 10 years imprisoned, then approximately 4.8 months or 146 days at the current payment rate). Thus, incarceration would delay the satisfaction of restitution by nearly a decade. Though this factor is not a substantial concern relative to the others discussed, it weighs in favor of a non-incarceration sentence.

## CONCLUSION

Overall, the court finds the balance of sentencing factors weighs toward a substantial variance from the Guideline range and toward a non-custody sentence in this case. The nature of the offense and Mr. Walker's criminal history weigh strongly toward incarceration. "Just punishment" also weighs toward incarceration, but less so than in other cases because Mr. Walker's lifelong addiction mitigates the underlying purpose of retribution. The court does not find that a custody sentence would promote respect for the law in light of Mr. Walker's

significant recovery efforts. Further, the goals of incapacitation and general deterrence appear to be indeterminate in this case and, when combined with the lack of any concern for specific deterrence here, they point no more strongly toward incarceration than a noncustodial sentence. The need for restitution weighs slightly away from incarceration. And the extraordinary circumstances of Mr. Walker's current characteristics and rehabilitation weigh strongly against incarceration. Finally, the need to avoid sentencing disparities weighs toward incarceration, but the court finds any disparities warranted in these circumstances.

"While science may have changed our views on drug abuse, the law still responds to drug abusers with punitive force, rather than preventative or therapeutic treatment." *Hendrickson*, 25 F. Supp. 3d at 1168. The court will not elevate Mr. Walker's criminal history over substantial and extraordinary evidence of rehabilitation. The Court determines that, considering all the factors under 18 U.S.C. § 3553(a), Mr. Walker's post-offense conduct, especially his exceptional rehabilitation after a lifetime of drug and alcohol addiction, the vast network of support from family and friends that he has proactively built, his advanced age, and the recommendations of his probation officer all warrant the sentence imposed, which is sufficient, but not greater than necessary to serve the purposes of sentencing. The court concludes that incarcerating Mr. Walker would not advance the purposes of federal sentencing policy. *See Pepper*, 562 U.S. at 519 (Thomas, J., dissenting) ("I believe that postsentencing rehabilitation can be highly relevant to meaningful resentencing. In light of Pepper's success in escaping drug addiction and becoming a productive member of society, I do not see what purpose further incarceration would serve."). Any term of imprisonment in this case would be counterproductive to sustaining Mr. Walker's extensive rehabilitation and would deprive the community of Mr. Walker's productivity and

contributions. Mr. Walker's post-offense conduct and self-rehabilitation strongly indicates he will not return to past criminal behavior and that incarceration is not needed to protect society.

For these reasons, the court sentences Mr. Walker to ten years of probation, with a mandatory review in five years, two years of home confinement, 500 hours of community service, and restitution, with the requirements and other details to be set forth in the Amended Judgment.

DATED this 18th day of May, 2017.

BY THE COURT:

Clark Waddoups
United States District Judge